### EDWIN H. VAN DEUSEN v. NANCY J. NEWCOMER.

*False Imprisonment in an Insane Asylum.*

In an action for false imprisonment brought by a patient in an insane asylum against the superintendent, the broadest latitude should be allowed in showing the jury what the patient said and did and how she appeared when there, as facts bearing on the question of her sanity. .

A patient who had been placed in an insane asylum as a pauper sued the superintendent for false imprisonment. *Held* (*a*) that evidence of what happened to the plaintiff before she was received at the asylum, was inadmissible; so was evidence as to her worldly circumstances and what had been done with her goods; and (*b*) it was inadmissible to show what the assistants, attendants or other inmates in the asylum had said or done to the plaintiff, unless it was said or done under the superintendent's directions; or that money sent to the plaintiff had not reached her, unless it is also shown that it came to the defendant or that he was instrumental in depriving her of it.

An expert cannot be asked for a conclusion upon facts not stated; as where a physician is asked his opinion as to what produced the condition of a patient as he observed it.

In an action for damages for false imprisonment, the plaintiff introduced evidence that she was a physician and offered to show the value of her practice. *Held* proper cross-examination to ask how she got it, as by advertising, through hand bills, or otherwise.

One cannot lawfully be placed or detained in an insane asylum against his will, unless actually insane.

The confinement of a person dangerously insane is always justifiable.

Officers having *quasi* judicial powers are not liable for injury resulting from acts done understandingly and in good faith within the limits of an authority expressly granted to them.

Whether the superintendent of an asylum is liable for detaining a sane person whom in good faith he believes to be insane—*Q:* COOLEY, J., and CAMPBELL, C. J., holding that he is; MARSTON and GRAVES, JJ., that he is not.

Whether in doubtful cases an inquisition to determine the insanity of a person is prerequisite to his confinement in an asylum—*Q:* COOLEY, J., and CAMPBELL, C. J., holding that it is; MARSTON and GRAVES, JJ., that it is not.

Error to Kalamazoo. Submitted November 20 and 21, 1878. Decided January 14, 1879.

TRESPASS ON THE CASE. The facts are stated.

*Dwight May*, for plaintiff in error, cited the constitutional requirement that institutions for the benefit of the insane shall always be fostered and supported (Const., Art. XIII., § 10), and argued that the right to restrain an insane person was a natural right that belonged to his relations and never depended upon municipal regulations, and that the State only interfered when the general public was interested. The provision that no one may be restrained of his liberty without "due process of law" is meant only to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established private rights and distributive justice. *Bank of Columbia v. Okely*, 4 Wheat., 235. Good faith and honest intentions should protect physicians and nurses from any liability for their conduct in the treatment of one who is put in their care.

*Henry F. Severens*, of counsel for plaintiff in error, as to the admissibility of evidence upon professional and hypothetical questions, cited *Kempsey v. McGinniss*, 21 Mich., 123; *Underwood v. Waldron*, 33 Mich., 235; *Hitchcock v. Burgett*, 38 Mich. As to the incompetency of evidence as to the mental condition of the plaintiff at the time of the trial, 1 Greenl. Ev., § 52; *Combs v. Winchester*, 39 N. H., 1; *Henman v. Lester*, 12 C. B. (N. S.) 776; *Com. v. Buzzell*, 16 Pick., 157; as to the competency of evidence of the details of plaintiff's conduct while in the asylum, *Beaubien v. Cicotte*, 12 Mich., 459; *Evans v. People*, 12 Mich., 27.

*D. Darwin Hughes* of counsel for plaintiff in error. It is argued for the defendant in error that as the statute for the appointment of guardians for insane persons gives the guardian absolute control of the person as well as of the property of his ward, the method by which an insane person should be put in an asylum should be by

the appointment of a guardian. It is a sufficient reply to this, that the appointment of a guardian for an insane person can only be made where the *fact of insanity* is combined with *the possession of some property estate,* and a large class would be left without the benefits of the asylum. But it is also argued that the asylum is a poor-house and that no one with property has any place in it, and this view excludes the operation of the statute relating to guardians. It would be inapplicable also, for the reason that the fact that an insane person is under treatment in an asylum does not interfere with the appointment of a guardian for him, or with the rights of guardianship.

The defendant in error cites some authorities which are all easily distinguishable from this case. In the Oakes case, decided in 1844, Judge Shaw said, "Taking all the evidence together we are of the opinion, that Mr. Oakes is under the operation of that degree of insanity which renders it proper that he be restrained in a hospital; that his insanity is temporary in its character, and that the restraint should last as long as is necessary for the safety of himself and of others, and *until he experiences relief from the present disease of his mind,*" and the order made was that he should remain in the asylum until the further order of the court. The question of danger was not made the test at all. In the case of *Chase v. Hathaway,* 14 Mass., 222, the statute contemplated a *judicial investigation* and *a judgment.* But it is always held that a statute providing for a judicial proceeding, recognized as such at the common law, will be defective and void if it fails to provide for *notice,* for the purpose of acquiring jurisdiction of the party defendant. In the Hathaway case the law was held void, for that reason. But there is no judicial proceeding provided for in this case for getting a person into the asylum or out of it. *Look v. Choate,* 108 Mass., 116, was a case where the patient was not brought by friends or relatives, or by any one having any right to the asylum: he was brought

there by a trespasser,—by a police officer acting without authority,—having no power over sanitary matters at all, and under the peculiar circumstances of that case, all parties were held to be trespassers from the beginning. The case of *Underwood v. People*, 32 Mich., 1, simply holds that a statute providing a judicial proceeding for the purpose of confining insane persons who have been charged with *crime* and have been acquitted on the ground of insanity, is void for failing to provide an adjudication of lunacy at the time of the confinement. The statute confined a person for being insane some time in the past, who might not be insane at the time he was confined. It was a police statute. The law establishing the asylum is a sanitary statute.

The constitution of Michigan declares that institutions for the benefit of those inhabitants who are insane, shall always be fostered and supported. At the outset, then, there is a distinction between the status of the Michigan Asylum for the Insane and that of any other institution to which any of these cases have reference. This institution under this constitutional provision, can, in no sense whatever, be viewed as a prison. The language of the constitution contradicts that. "They shall always be fostered and supported *for the* BENEFIT of persons who are insane,"—not for their *punishment.* They are hospitals for the curing of mental diseases; but in no respect mere places of restraint. Restraint is but an incident in the *treatment* of the disease. This institution differs only from hospitals for the treatment of mere physical disease, in the fact that in the one case the patients are reasonable beings, capable of judging for themselves, and of safely controlling their own actions and their own treatment; and in the other case, the patients are irresponsible beings, incapable of judging what is proper for their own safety or their own cure. For the latter class of cases the constitution has founded this asylum, and has provided as plainly as if it said in so many words, that that asylum is a proper and fit

place for insane patients. That constitutional provision is "due process of law," and is the fundamental law governing the case of every one who is insane, and who needs the benefit of treatment. The constitution then, so far as the right to restrain an insane person is concerned, executes itself. In providing a place for the benefit of these unfortunate persons, it impliedly involves the power to place them there. No legislative enactment was necessary to confer the power to treat a person in an insane asylum in good faith placed there as a fit subject for treatment. The constitutional provision has, however, been carried into effect by a statute providing for the organization of the asylum, and the erection of the necessary and proper building. When this institution was organized and the building erected and ready for the reception of patients, nothing remained to be done to perfect the machinery for admission to it, except as to a certain class of persons. The doors of that institution were at once wide open to persons who could go there with money and pay their way. But if only such could be admitted, you see lying in your pathway an infirmity in the system which would shut out persons not able to pay for their treatment. Only to the patient able to lie idle in that harbor of security and pay his own board and maintenance was the asylum complete. Friends of insane persons might take them there, and justify the act by proving the single fact of insanity and good faith. The mere fact of insanity and good faith will justify; and even in determining the existence of insanity, the same question of good faith must enter into the inquiry; and if it should turn out that a mistake has been made, good faith should not only mitigate damages, but should prevent a recovery; because when a patient is in the Kalamazoo asylum, he is in the custody of the law and its officers. The statute has made no affirmative provision for the admission of such private patients into the asylum, and none was needed. The constitution establishing the institution for

this express purpose is the warrant, and the insanity is the cause for putting it in motion. That the legislature considered the constitutional provision sufficient authority is clearly shown by the statute, which provides that where a person has been sent to an asylum by his friends, and becomes indigent afterwards, then on application to a certain tribunal—the judge of probate—an order can be made to maintain him there six months longer as an indigent person. That is a legislative construction of the constitutional provision. It is a declaration by the legislature that an asylum is a place where patients may be legally placed by their friends. It provides what may be done in case of a person put in the asylum by his friends that becomes indigent after being sent there.

What then remained to be done after the asylum was built and ready for patients? It remained to provide for the maintenance therein of those doubly unfortunate persons who, in addition to their mental disease, were afflicted with pecuniary incapacity, and not able to maintain themselves while in the asylum. Without that provision this asylum was an asylum for *the rich*. The Legislature proceeded, not to enact laws for the protection of anybody—we reject that idea; it is not found in the theory of the asylum act—but proceeded to enact the necessary laws *to confer the benefits* of the asylum upon all. To accomplish this it provided for three classes of persons: (1) For persons chargeable to some county or town—in other words, paupers. It empowered the county superintendents of the poor or supervisor to send paupers to the asylum by an order under their hands. (2) Indigent persons, not paupers. It provides that application *in their behalf* may be made to the probate judge, who investigates the fact with or without a jury, and decides on the questions of sanity and indigence. And if he finds these issues both in favor of the patient's claim, he gives a certificate upon which the patient is admitted to support in the asylum at the public expense.

(3) The third class provided for is persons who become indigent after being sent to the asylum by their friends. These provisions, in our view, make the legal scheme to the asylum complete and perfect. It is authorized, founded and established by the constitution of the State; its support and maintenance are made obligatory upon the Legislature, and its halls declared to be a fit and proper place for insane persons, and to have been erected and maintained *for their benefit.*

The order of the superintendent of the poor and the certificate of the judge of probate are not authority to imprison a patient; they are authority to the patient to demand admission and treatment *at the expense of the public;* these statutes are made to enable paupers to get into the asylum; they are not made for the protection, but for the *benefit* of the patient. The superintendent's order is not a warrant authorizing the patient to be received and kept. This could be done without an order, if the patient could pay his way. In case of an indigent person, a petition to the probate judge is made "in his behalf." No notice is served on him; but notice is given to the prosecuting attorney to *defend jor the county.* The statute says he shall be admitted into the asylum and supported there at the public expense. By the asylum law no adjudication is necessary to be received into it; persons are not *committed* to it, they are *admitted.*

It may be said that this construction of the law makes it possible to confine sane persons, and that there is no protection against encroachment upon their personal liberty. The answer to that is, that the board of trustees, the numerous attendants, the board of State charities, the visiting committees of the Legislature, and the official duty and power of the Governor, are all a protection. If anything in the history of the asylum or this case has disclosed the necessity for such safeguard, the Legislature has the undoubted right to make it; but heretofore no such necessity has appeared to exist, nor is it believed that any does now exist. The enlightened

and humane spirit of the age, the same christian, liberal impulse that has reared this noble structure, is the best safeguard of its inmates.    The writ of *habeas corpus*, the high character of the persons having the institution in charge, the fact that they are public officers and responsible to the appointing power, have been found, so far, an adequate protection to the inmates of the Insane Asylum.

There are no such institutions as the Kalamazoo asylum in England.    The statute of 1845—the 8th and 9th Victoria—provides for more than twenty commissioners in lunacy, who are very eminent gentlemen.  This commission has power to grant licenses to private houses also, as insane hospitals.    These houses are kept for profit. The statute provides that any person—a stranger—may sign what is called an order or request for the admission of another into a public asylum or one of these licensed houses.    He must obtain in addition the certificate of two physicians that the party is a fit subject for treatment, and within twenty-four hours after he is admitted these certificates, or copies of them, must be sent to a commissioner in lunacy.    That was the scheme of the lunacy laws of Great Britain when in 1877 the English House of Lords raised a commission for the purpose of examining and reporting upon them.  Mr. C. S. Percival, who was secretary of the commission of lunacy, was called before that committee, and his testimony brought out the curious fact that there was no statutory provision for taking a private patient to an asylum, and that the police had no authority whatever in the case of a private patient. In his opinion the medical certificates were the most important safeguards to the personal liberty of the subject.

The following may be regarded as the general result of the evidence taken:

"That if mistakes which affect the liberty of the subject injuriously occur in the workings of the present lunacy laws, they are few, and usually soon remedied; that the present system and forms of admission into asylums in England and Scotland have worked fairly

40 MICH.—13.

well, but that there is great need of some change in Ireland whereby *the poor*, who are taken with mental disease, shall not be treated *as criminals* and sent first to gaols and then to asylums by a *criminal* process; that the present mode of local inspection of lunatics in the United Kingdom is wonderfully thorough and effective; that the commissioners in lunacy and inspectors of asylums in the United Kingdom are most efficient guardians both *of the insane* and *of the liberty of the subject*, but that in England they are too few in number."

But the licensed houses are scattered over England, while in Michigan the system is a consolidated government system, not presided over by a person licensed to treat insane persons, but by an officer—by the State itself.

The criticism made by the commission upon the law which authorized the "stranger" to sign this order was that no stranger in blood should give an order for any patient's admission to an asylum, but to provide for cases where no relations are near, they suggested that the justice's order, as in pauper cases, be an alternative for all private patients.

And no living man, lawyer, jurist, or civilian, so far as authority throws any light upon the subject, has ever dreamed that these licensed houses, when they receive a patient upon the order of a private individual—a total stranger to them—and on the certificates of two physicians, ever infringed upon the liberty of a citizen of Great Britain as guaranteed to him in the magna charta, the very origin of the constitutional provision which is invoked in this case.  And never, until now, I believe, has it been asserted in America that the confining of an insane person by his friends, or by an officer duly appointed to the custody of such persons by the State under its constitution, so long as he acted in good faith, infringed upon that provision of the constitution of Michigan, which guarantees the liberty of all.

But it is said that no person shall be deprived of liberty without due process of law.   This constitutional provision formed the basis of the theory upon which this

case was put to the jury. This was erroneous for the reasons that, (1), the constitutional provision establishing the asylum must be construed to have its full effect, because the constitution, like a statute, must be construed so as to give operative effect to all its provisions; (2), if the other provision stood alone it would have no application to insane persons. That provision was enacted while the humane laws of domestic relations existed, and must be construed in harmony with them. It does not interfere with the right of a parent to the custody of his child; the teacher to the custody of his pupil; the physician, the nurse and near friends to the physical control and confinement of a patient. It does not prevent the restraining of insane persons from committing suicide or homicide by confining them. It does not prevent the restraining of any person who has become mentally irresponsible. The common law has always recognized the power of natural guardians. By it the father is the natural guardian of the child; and if there be no father, the mother; and if no mother or father, the next of kin; and if there be none, then any person standing in *loco parentis*. So that the "due process of law" provision has no application to prevent the control and proper treatment of an insane person by his friends, or his natural guardians, or by officers appointed by the State for that purpose, so long as they exercise this right in good faith. (3) This is the construction which the Legislature has placed on the constitution; for even in the case of paupers and indigent persons the proceedings do not amount to due process of law, as announced and interpreted by the judge who tried this case. By due process of law he meant antagonistic law; one which took something away from the person— a depriving law; one that deprives of life, liberty or property. The proceedings are not, in this case, antagonistic even to the patient; they are on his behalf, and in his name and for his benefit. They deprive him of nothing, but they place the benefit of this institution

within his reach. As already argued, they are enabling acts, in no degree antagonistic to the patient, and intended not for his protection, but for his aid. (4) It was even admitted by the court below that a dangerous person may be restrained. The court said: "The right to restrain an insane person of his liberty is founded in the great law of humanity which makes it necessary to confine those whose going at large would be dangerous to themselves or others." This doctrine is correct, but the court erred in restricting it to such insane persons as the jury might find were dangerous to themselves or others, disregarding utterly and totally all questions of good faith, as shedding light upon the legal right. The court admitted that dangerous insanity would be a justification, and left it to the jury to say whether the plaintiff, if insane, was dangerous. We assert that *all insane persons are dangerous* to themselves and to others, and this, as a matter of law, and it is nonsense to leave it to a jury to say whether an insane person is dangerous to go at large. The patient is an irresponsible being to the extent that the law does not condemn him for any act however atrocious or criminal, done under an insane impulse. Not a day passes but some one either commits suicide or homicide, or other acts of insanity, in fits of insanity; and often after the act is committed it is remembered that the person committing the deed had acted strangely, and a careful examination of the case develops the fact of undoubted insanity. That danger to the patient and others must be inferred, as a matter of law, from insanity, it would seem, is too clear for dispute. Upon this subject of danger I have made a statistical table from the records of this very institution, showing the state of 2,395 patients presented for admission into this asylum. Out of this number 1,481 had either committed violence, or threatened it to themselves or others. In 610 no syptoms in that respect were noticed, and in 304 the history did not reach to that extent; 481 had committed actual violence toward others;

203 had threatened violence to others; 168 had attempted homicide, and 330 had attempted suicide; 16 were afflicted with kleptomania; 40 were pyromaniacs, and 243 had manifested destructive propensities in other directions.

The law, as we contend for it, is reasonable and in complete harmony with the subject, and with the theory upon which the asylum was established. A preliminary adjudication of the mental condition is not only unnecessary, but it is an affirmative injury to the patient, for the following reasons:

*First.* It would deter many sensitive persons from placing patients in the asylum who ought to be there. No person having any sensitiveness whatever in his nature cares to have spread upon a public record, open to the inspection of all, a recorded judgment against his sanity. It is to be avoided,—avoided not only for reasons of delicacy and just pride, but for sanitary reasons.

*Second.* Such an adjudication must involve such an examination of the patient and such consequent excitement as to increase the severity of the disease. In mental diseases it is a recognized fact that *quiet*, of all things, is desirable, and that excitement of every kind is to be avoided.

*Third.* The delay necessary for such adjudication may enable the mischief to be accomplished. All authority agrees that early treatment of the insane is a necessity. Dr. Maudsley's testimony before the English commission showed that "He was strongly of the opinion that the present forms for the admission of private patients into asylums or private houses were quite sufficient, and if made more stringent would operate injuriously on their early treatment and chances of recovery. *Q.* 'You think that if there was more care taken, more delay in admitting or consigning patients to asylums, their cure would be more doubtful?—*A.* Undoubtedly; there are two great objects to be kept in view with regard to the detention of patients; they are put under care, not only for their own safe custody, because they are dangerous to themselves or others, but another, and more important object, if insanity is to be cured, is, that they be put under care for treatment, and early, because recoveries are entirely in proportion to

the early stage at which treatment is adopted. If regulations are made more stringent than they are now, and, indeed, the present regulations operate to some extent in that direction, the friends of patients will, instead of sending them from home, as is almost essential in a case of insanity,—unlike in this respect other disease,—keep them at home under improper conditions, and so very much injure the chance of recovery.' *Q.* 'Would that early treatment necessarily involve sending them from home; could they not be treated to a certain extent as out patients?—*A.* If a patient is sent from the care of his own friends, even if it is to a private house, it is absolutely necessary to go through the same forms as you go through to place him under care in an asylum; and my experience as a physician is that friends shrink very much from doing that. They dislike the supposed publicity of it; they dislike the formally pronouncing him to be a lunatic; and they will not remove him from home in consequence.'"

In this connection I wish to submit, upon the subject of the necessity of early treatment of the insane, another set of figures which I have compiled from the records of this asylum.

*Recovery as affected by duration of disease before treatment.*

| CONDITION AFTER TREATMENT. | SEX. | DURATION OF DISEASE PRIOR TO ADMISSION. | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Under two months. | Two mos., under 5 months. | Five mos., under 9 months. | Nine mos., under 12 months. | One year, under 2 years. | Two years, under 5 years. | Five years and over. |
| RECOVERED | Male | 138 | 65 | 38 | 20 | 31 | 23 | 8 |
| | Female | 99 | 60 | 31 | 19 | 29 | 31 | 8 |
| | Total | 237 | 125 | 69 | 39 | 60 | 54 | 16 |
| IMPROVED | Male | 18 | 14 | 31 | 1 | 30 | 37 | 27 |
| | Female | 7 | 16 | 20 | 4 | 27 | 31 | 28 |
| | Total | 25 | 30 | 51 | 5 | 57 | 68 | 55 |
| UNIMPROVED | Male | 5 | 6 | 11 | 2 | 35 | 48 | 40 |
| | Female | 12 | 8 | 15 | 4 | 26 | 56 | 64 |
| | Total | 17 | 14 | 26 | 6 | 61 | 104 | 104 |
| DIED | Male | 9 | 14 | 12 | 4 | 19 | 21 | 17 |
| | Female | 12 | 21 | 14 | 3 | 18 | 29 | 24 |
| | Total | 21 | 35 | 26 | 7 | 37 | 50 | 41 |
| REMAIN | Male | 26 | 35 | 27 | 3 | 49 | 60 | 59 |
| | Female | 27 | 30 | 27 | 6 | 58 | 79 | 68 |
| | Total | 53 | 65 | 54 | 9 | 107 | 139 | 127 |
| TOTALS | Male | 196 | 134 | 119 | 30 | 164 | 189 | 151 |
| | Female | 157 | 135 | 107 | 36 | 158 | 226 | 192 |
| | Total | 353 | 269 | 226 | 66 | 322 | 415 | 343 |

I have read this for the purpose of showing that a moment's delay is to be avoided, not on account so much of the injury which patients may inflict upon others, as to enable them to receive what the constitution declares they are entitled to—the fullest benefits of this insane asylum.

*Fourth.* The disease is often so obscure and subtle as to be detected only by the near relatives; those who discover differences in the patient not open to the observation of a stranger or a casual acquaintance; and in some cases an expert may be necessary to detect the fact of insanity. And would you compel that expert to go before a jury, or any tribunal or any officer or body of men, and testify in the presence of the patient and cause him to undergo that excitement, or would you have it quietly done?

*Fifth.* If a tribunal is needed, if this question must be passed upon either judicially or ministerially (and it is but a ministerial act anyway), I submit that the medical superintendent of the asylum, being the hand and the instrument of the State (a public officer paid by a salary, and not by fees or board bills), and his assistant physicians, are presumed to be competent experts, and they are to determine whether a person is a fit inmate for the asylum or not, and their judgment and conclusion is much more likely to be correct than any other tribunal you can create. They are men placed there not only for their learning in this department of medical science, but for their integrity. The law for which we contend, which, under the constitution of this State, creates Dr. Van Deusen an officer to decide upon the fitness of a patient to be treated there, creates the best of all tribunals that could be made in that behalf. That is due process of law.

I have sought to urge upon your honors the theory that the treatment of a person in that institution against his or her will at the request of friends (the medical superintendent acting in good faith in the discharge of

the functions of his office), creates no liability, even if the patient should turn out to be sane, even for nominal damages; that the test is good faith; that the idea that the personal liberty clause in the constitution has any reference to any such sanitary institution as the Michigan asylum is utter nonsense on its face; that no effort has been made by the Legislature to protect the liberty of the citizen in that institution, and that if any such protection is necessary the legislative department of this government can make it.

*Frazer & Gates, J. Logan Chipman, O. W. Powers* and *Thos. R. Sherwood* for defendant in error. One cannot be restrained of his personal liberty on an *ex parte* proceeding and without notice, *Chase v. Hathaway*, 14 Mass., 222; *Breed v. Pratt*, 18 Pick., 115; *Conkey v. Kingman*, 24 Pick., 115; *Exp. Runey Dey*, 9 N. J. Ch., 181; *Exp. Vanauken*, 10 N. J. Ch., 186; *Shumway v. Shumway*, 2 Vt., 339; *Eddy v. People*, 15 Ill., 386; the necessity caused by dangerous insanity is the only justification for the confinement of a lunatic without due process of law (*Anderdon v. Burrows*, 4 C. & P., 210; *Nottridge v. Ripley*, 2 Law Rep., (N. S.), 279; *Cobey v. Jackson*, 12 N. H., 526; *People v. Turner*, 55 Ill., 280; 8 Amer., 645; *Owing's Case*, 1 Bland, (Md.) Ch., 290; *Lott v. Sweet*, 33 Mich., 308; *Look v. Dean*, 108 Mass., 116: 11 Amer., 323; *Underwood v. People*, 32 Mich., 1), and the kindness shown him by his keepers only affects the question of damages, *Page v. Mitchell*, 13 Mich., 63; *Josselyn v. McAllister*, 25 Mich., 45; *Welch v. Ware*, 32 Mich., 77. Every interference with personal liberty is *prima facie* unlawful, Waterman on Trespass, § 381; *Perry v. Buss*, 15 N. H., 222. The authority of a lunatic's husband over her is greater than that of her mother, brother and sister combined (*Denny v. Tyler*, 3 Allen, 225; 2 Kent's Com., 181), and the control of a husband over his wife and of a parent over his child are the only restrictions on personal liberty imposed by the common law in favor of relatives as such. Cooley's

Const. Lim., 339. Superintendents of the poor have no authority over persons who are not paupers; their acts relating to such persons are void, *Smith v. Shaw*, 12 Johns., 257; *Tyler v. Pomeroy*, 8 Allen, 480; *Wise v. Withers*, 3 Cr., 331. The superintendent of an insane asylum is liable for what is done by his subordinates under his control, or for natural consequences, *Murray v. Charming Betsey*, 2 Cr., 64; *Green v. Kennedy*, 46 Barb., 16; *Clark v. Axford*, 5 Mich., 182; *Wall v. Trumbull*, 16 Mich., 245. The opinions of medical men are admissible as to the cause of disease. 1 Greenl. Ev., § 440.

MARSTON, J. Mrs. Newcomer, the defendant in error, brought an action against plaintiff in error for falsely detaining and imprisoning her in the insane asylum at Kalamazoo.

The plaintiff below was taken to the asylum in October, 1874, and was there received by the defendant, who was then medical superintendent of that institution. She left the asylum in August, 1875. Plaintiff was a physician and had been residing at and practicing her profession in Toledo, Ohio. In the summer of 1874 she left Toledo and came to Calhoun county in this State for the purpose of visiting with her daughter, who was then a resident of that county. Although plaintiff and her husband had not been legally separated, yet they were not living together. At this time she was possessed of real and personal property claimed to be of the value of some $3,000.

There was an abundance of testimony introduced on the trial tending to show that previous to, at the time she was taken to the asylum, and while there, she was insane, but was not by any one considered dangerous, either to herself or third persons. There was also abundant testimony introduced tending to show that she was taken to the asylum at the request of her friends, and that she remained there with their full knowledge, con-

sent and approval until discharged as convalescent and taken home by them.   There was also testimony in the case tending to show that at the time she was taken there she was not and had not been insane; that her friends "thought she was in a weak, poor state, and very nervous;" that they supposed she would have that rest and quiet there which she so much needed; that there was a department at the asylum where such patients had all sorts of recreation and amusements, and would receive medical treatment, and that under such a belief they consented that she be taken there.

There was no evidence tending to show that her friends did not act in entire good faith, or that they had any bad or other motive than her good in consenting that she be taken to or in permitting her to remain at the asylum.

They requested one E. H. Johnson, who was then one of the superintendents of the poor of Calhoun county, to take the plaintiff to the asylum.   On so doing he, as such superintendent, delivered to the medical superintendent written authority to receive her as an insane pauper.   This, as a justification to the defendant for receiving her, was abandoned on the argument and will not be farther considered.   It was conceded, and the court so instructed the jury, that there was no evidence in the case of any conspiracy between the defendant and any other person to put or confine the plaintiff in the asylum, except what was shown by the interviews between defendant and Johnson at the time of plaintiff's reception at the asylum; but as the evidence concerning these interviews had no such tendency, the case must be considered upon the basis that the defendant, acting as such superintendent, received, detained and treated the plaintiff as an insane person, and that he acted in entire good faith in so doing.   After receiving her a written statement was filled out by her sister, giving plaintiff's personal and family history, which certainly contained strong statements indicating insanity; also that an aunt

on the maternal side had been insane for a short time, and that plaintiff had a previous attack of insanity when 22 or 23 years of age, but stating that no facts as to the cause thereof could be given, at which time she attempted to commit suicide, but that she never tried to injure others, and that it had never been necessary to confine her closely. This statement was filled out upon a blank in answer to certain questions in accordance with the rules and regulations of the institution.

The Kalamazoo asylum was and is a State institution. The defendant has had charge therein as superintendent since 1859. Previous to that time he had experience in the New York State Lunatic Asylum at Utica. That he was a well educated physician, experienced in the treatment of the insane, and entirely competent for the position to which he was appointed, has not been questioned.

The position taken by counsel for the plaintiff, and upon this theory the case was submitted to the jury, was that insane paupers of any county could be sent to the asylum by the superintendents of the poor of that county, and that they, being a body corporate, consisting of three members, the power given them could only be exercised by a majority, and not by one of the board; that the superintendents of the poor have no authority over persons not paupers, and should they attempt to interfere in such cases their acts would be void; that the relatives of an insane person cannot, without due proces of law, which would require an examination and judicial determination of insanity, authorize their confinement in an asylum, unless a necessity exists therefor caused by the dangerous character of the insane person; and that whatever authority the relatives may possess, other things being equal, the nearest relative must possess the greatest authority, which in this case would have been the husband, and after him the mother of the plaintiff. It was also claimed that under the statutes of this State relating to the asylum, no provision had been made for, or authority given to receive insane persons who had

sufficient means to procure care and treatment elsewhere; that "the Michigan asylum for the insane was not built for the rich; it is a charitable institution, founded for the care and protection of the pauper insane of the State." And that the good faith of the defendant in receiving, detaining and treating the plaintiff could have no bearing in the case, except as it might affect the question of damages.

I cannot concur in the view thus presented that the "Michigan asylum for the insane was not built for the rich." If by this it was meant that it was not built for them *alone*, but that all insane persons, no matter what their pecuniary relations or those of their relatives might be, I could agree therewith, but such was not the argument advanced.

The statute relating to this asylum authorizes pauper insane persons to be sent to it by an order under the hands of certain officers, and the expense of sending and supporting such insane person there is to be defrayed by the county or town to which he may be chargeable (Comp. L., §§ 1930, 1931). Indigent insane persons, not paupers, may also be sent there at the public expense on the certificate of the probate judge (§ 1934). Other cases: Persons acquitted of crime on account of insanity; insane persons under criminal charge or imprisoned under civil process, may also be sent there. In all these cases, except the pauper insane, where the county is required to defray the expenses in the first instance, a right is given to recover the amount so paid from such insane person's estate, if he have any, or from any relative, etc., that would have been bound to provide for and maintain him elsewhere (§§ 1938, 1939, 1943 and 1944). The statute in thus providing for these several classes does not necessarily exclude any and all others from being received therein. It must be assumed that at an institution built up and fostered by the State, for the special and exclusive purpose of treating the insane, that

superior advantages and facilities will be there found for such purposes over those furnished by any private institution, within the reach of a large class of the people of this State. It was not the design that any should be excluded from its halls; it was erected by the State for the use and benefit of the unfortunate insane, in the hope that by proper treatment their reason might be restored, and that during confinement therein they should have that care and attention which the private family could not afford or give, by those specially qualified by study and experience in the treatment of such a disease.

The State was no more interested in having the pauper and indigent insane restored to health and reason than in having those of all other classes, but it was especially necessary that the expenses attending their care and treatment while there should be provided for, else they could not gain admission at all. In my opinion chapter 52 of the Compiled Laws plainly contemplates and provides that those who have, and whose relatives have, abundant means for their support, may be received, and this at the request of their friends. Section 1934 provides that when a person in indigent circumstances, and not a pauper, becomes insane, application may be made in his behalf to the probate judge of the county where he resides, who shall fully investigate the facts, and if he certifies that satisfactory proof has been adduced showing him insane, and that his estate is insufficient to support him and his family, or if he has no family himself, he shall be admitted and supported at the expense of the county. It is clear that under this section the application to the probate judge may be made by any competent person resident of the county, and that the making of such an application is not limited to the friends of such insane person. And this section clearly contemplates and provides for cases where such indigent insane person is without friends, as that term is here used. Under this section when such persons are sent there they are

supported at the expense of the county until restored to soundness of mind, if effected in two years.

Section 1937 contains provisions for an insane person in indigent circumstances who has been sent to the asylum by his friends, who have paid his bills therein for six months, under certain circumstances becoming a county charge. This section certainly does not seem to contemplate that such person shall be sent there by the probate judge after an investigation. It is only under section 1934 that the probate judge can send an indigent insane person to the asylum, and when he does, the charge in the first instance is to be paid, not by his friends, but by the county. Under section 1934 an indigent insane person is sent to the asylum and received on the certificate of the probate judge. Under section 1937 he is "sent to the asylum by his friends," who pay his bills. Under section 1937 no order or authority from any official or tribunal is required to send such person to the asylum. He is not sent there after an investigation and determination of his insanity has been made at the request of his friends, but he is sent there directly by them in the first instance.

Section 1936 requires the superintendent to keep a record of the patients, with the name, residence, office and occupation of the person by whom and by whose authority each insane person is brought to the asylum. Unless we can say that the terms here used, "office" and "occupation" are synonymous, or that the *official* position, and the *occupation* of such official, bringing such insane person to the asylum, and by whose authority he is brought there, must be given, we must conclude that others than those holding official positions may both authorize and take insane persons to the asylum. But this section farther requires "all the orders, warrants, *requests*, certificates and other papers accompanying him to be filed." The word *requests* as here used cannot have any reference to the application made, under which proceedings are instituted, nor is it applicable to any order,

warrant or certificate of any official authorized by this statute to send persons to the asylum or to any court. It can but refer to a request coming from the friends of the insane person, and which has been considered as sufficient to warrant the superintendent in receiving such insane person. So under section 1943 every insane person supported in the asylum is declared to be personally liable for his maintenance therein, and for all necessary expenses incurred by the institution in his behalf, and the committee, relative, city or county, bound by law to provide for and support him, is also made liable to pay such expenses.

It seems quite clear to me that these several provisions recognize the right of the friends and relatives of an insane person to request his reception at and treatment in the asylum, and that no other, farther or different process is required, nor is there anything indicating that only the dangerously insane can be so received.

The legislature has provided that those who are wholly or partially dependent upon the public for support shall be sent to and received at that institution, and it was made the official duty of certain officers to send them there at the public expense. In no other way could they have gained admittance. When however the insane person or his relatives had sufficient means to pay the expenses, no such necessity for official action existed; they could be taken there and cared for without any expense to the public whatever.

The investigations authorized to be made by the probate judge in the cases referred to were not so much for the purpose of ascertaining and determining the question of insanity, although it must be found to exist, as it was to determine "the case as to his indigence," so that the public should not be burthened by supporting at the asylum insane persons possessed of abundant means. Where the county superintendent of the poor or a supervisor sends a person already a public charge, and who becomes insane, to the asylum, no investigation

whatever is required, either as to his sanity or otherwise. Under such circumstances it seems to me it could not have been the design that a parent possessed of abundant means could not have his child received and treated at this institution, if he were willing to pay the expenses attending the same, that the friends of the indigent and pauper insane could command the doors of the asylum to be opened for their benefit at the public expense, while all others might knock thereat in vain; that a pauper or indigent insane person could be taken there and received without any previous investigation as to the question of insanity, while as to all others there must be a judicial determination of that fact. If such an institution offers superior facilities for the care and treatment of the insane, a fact pretty generally conceded, then it seems to me that all should be received, irrespective of their pecuniary circumstances; that the great primary object of the institution is to restore to reason all who are of unsound mind; to this extent all have equal rights, and to this extent no distinction whatever should be permitted to exist. The restoration to reason of a person of unsound mind, of wealth, refinement and education, surely should concern the State equally as would the restoration of one less fortunate. The expense attending the treatment is an entirely different question, and herein lies the only distinction, in my opinion, that has been or should be made.

It may be of the utmost importance, in many cases, that speedy aid should be afforded, even although no dangerous symptoms are manifested, and where delays would but aggravate and render more slow and difficult a recovery. In a very large majority of the cases the natural love and affection of the friends and relatives of the person so afflicted, and their watchful and jealous care of all unnecessary restraint, will prove a sufficient protection against abuse. There may be cases where no such love, affection or watchful care will exist, and where for sordid or other unworthy motives, parties may

be deprived of their liberty under a pretense of insanity. This may be so, but whether where relatives thus act upon their own responsibility they do not act at their peril may be a question of very great importance, but which does not arise, and therefore will not be passed upon in this case. The judgment of a competent tribunal having jurisdiction is a protection for acts done thereunder, and no one would be permitted to show, however clearly it might be made to appear, that such judgment standing unreversed was erroneous. It does not necessarily follow that all unreversed judgments are right in fact. Many an innocent man has been wrongfully and unjustly convicted and sentenced and suffered the full penalty of the law. Yet the judgment was a protection to those who detained and restrained him of his liberty. And yet judicial investigation is justly considered as the great safeguard of our liberties. While it does not in fact import absolute verity, yet it reduces the dangers perhaps to the lowest minimum. There are many instances where without a judgment or process of a court, an act may be done, but at the peril of the person acting, who, when called to account therefor assumes the burthen of proving that he was justified in what he did, and the same rule might apply in this class of cases where the friends or relatives act upon their own responsibility.

But where a person is brought to the asylum by, or at the request of, his relatives, would the superintendent thereof, who after a careful investigation and examination of the patient in good faith, and a belief based thereon that he was in fact insane, act at his peril in receiving, detaining and treating him thereafter?

I am clearly of opinion that he would not be liable under such circumstances, even although it should be made to appear that the person received was not insane. The good faith of the superintendent must be to him a protection, as it is at least questionable

whether in very many cases he can have any other. The judgment of a court sentencing a person to imprisonment as a punishment for an offense of which he has been found guilty, and the execution issued thereon, prescribe a definite period, at the expiration of which, but not before, the person is entitled to his liberty, and no reformation of character which he may undergo in the mean time will entitle him to his liberty one day sooner, except under some special statutory provision. And the person under whose care he is placed can under no circumstances be held liable for false imprisonment in detaining him the full period of time mentioned in the warrant of commitment. Not so, however, is the case of a person sent to the insane asylum. If sent there by the superintendents of the poor or by the probate judge, no definite time is by them fixed for his detention. He is to be received and to remain there "until he shall be restored to soundness of mind," and not a single day or hour longer can he be detained against his will. But who shall determine the fact that he has been restored to soundness of mind? When the patient is convalescent it may be a matter of considerable nicety, and about which competent persons might differ in opinion as to the exact time when soundness was restored. During such a period, does the superintendent, acting in good faith, with a full knowledge of the condition of the patient, and firmly believing that soundness of mind is not fully restored, act at his peril in detaining him? Or in a case where the probate judge has had an examination, and a jury has determined that the person is insane, and he is sent to the asylum as an indigent insane person, under the certificate of the probate judge, but the superintendent on his arrival believes, after an examination that the person is not and has not been insane,—would he be justified in receiving and retaining him under such circumstances? He would have the verdict of a jury rendered perhaps the very same day declaring the person insane, whom he believed was not.

Surely that might seem to be a protection, but would it be? Must not the superintendent in all these cases act in accordance with his own belief? Can he be given any other guide? And if he errs, which is possible, shall he for such error of judgment, notwithstanding the fact that his motives were pure and praiseworthy, be held liable in damages therefor? If so, then he acts in a most difficult and dangerous position. He acts not alone at the peril of the person being insane in fact, or that soundness of mind has not been fully restored, but that a jury will so find upon a trial had months or even years afterwards, when the person is acknowledged by all to be no longer insane,—when all the facts and circumstances which were daily seen by the superintendent and his assistants, and which satisfied him and them of insanity at the time, can no longer be seen or presented to the jury with all their force, while the supposed sufferings of the patient while there, proper if insane, but not if sane, will be presented in strong contrast to arouse their sympathies.

Under such circumstances we might find the Superintendent of the State Insane Asylum held responsible in damages for detaining a person who was insane in fact, but whom a jury, upon an investigation made long afterwards, should determine had not been. Things equally unlikely and improbable have happened.

This would not however be the full extent of the dangers he would run. He is the head of the institution and has "the direction and control of all persons therein," and it was made his especial duty to "daily ascertain the condition of all the patients and prescribe their treatment." Now, no matter how clearly his duties may have been prescribed, yet owing to the large number of patients in such an institution, a personal examination of them daily, to ascertain their condition and to prescribe for their treatment, would be beyond the power of any one man to perform. Much of this labor must, from the very necessities which exist, be performed

by others, whom the superintendent would not have the sole power of appointing and discharging, and yet for their errors and mistakes of judgment he must be held responsible. Such an extended liability as is claimed in this case, would operate as a perpetual bar to any person possessing the necessary qualifications for the position accepting the same, and would soon leave the institution at the mercy of men of no character, responsibility or experience. Under such a rule the legislature, with all its power, could not carry out the constitutional injunction to foster such institutions for the benefit of those inhabitants who are insane.

Under the view taken will the liberty of the citizen be sufficiently protected? I think so.

The Michigan Asylum for the Insane is not a private but a public institution. Its medical superintendent and his assistants do not receive fees or a salary in any way dependent upon the number of inmates. They receive a fixed salary, paid out of the State treasury, so that they can have no motive, other than a proper one, in an increase in the number of inmates in the institution. And should any one of them for corrupt purposes receive or attempt to detain any person improperly, it surely would be promptly discovered by some of the officers, unless all were alike corrupt and interested in his detention,—something which is very unlikely to occur.

Besides this the statute provides for the appointment of trustees by the Governor by and with the advice and consent of the Senate, to whom are given the government and sole and exclusive control of the asylum. They are to see that its design is carried into effect and everything done faithfully according to the requirements of the legislature and the by-laws and rules of the institution. They fix the salaries and allowances of the officers; they establish by-laws; they are to ordain and enforce a suitable system of rules and regulations for the internal government, discipline and management of the asylum.

They are to keep a record of their doings, open at all times to the inspection of the Governor and of all persons whom he or either house of the legislature may appoint to examine the same. It is their duty to maintain an effective inspection of the asylum. A committee of their number for such purpose is required to visit it every month, a majority of the board once every quarter, and the whole board once a year. They are to keep a record of the date of each visit and the condition of the house and patients, and the result of these inspections is to be submitted to the legislature in January of each alternate year. It is true, notwithstanding these and all other safeguards which have been or may be thrown around this institution, that abuses may exist and pass unnoticed. So it is however with all human institutions; the powers given them may be abused. At some point there must be a presumption that official duties will be properly performed, and I do not see why we may not presume that these officers and trustees will honorably and conscientiously perform their several duties, and prevent this, one of the most charitable and beneficent of our great State institutions, from becoming a prison or aught else than that for which it was designed.

No matter what safeguards may be provided, as to a determination of the question of insanity in the first instance before the patient can be received, and which might exempt the superintendent from all liability in receiving him, the question as to his detention must still be left open. Unless the good faith of the superintendent will protect him in detaining a patient until soundness of mind is in his opinion restored, I can imagine no possible way in which he can be guarded against actions brought and damages recovered by persons claiming that they had been detained longer than was necessary for their complete restoration. If good faith would be a defense in such a case, I can discover no good reason why it should not in all others. No valid reason, in my opinion, exists for any such distinction. Neither in

the receiving nor in the detention of an insane person can his consent be required. Consent would imply sanity. The consent of an insane person, incapable in law of consenting, cannot be required as a condition precedent in either event.

To hold the superintendent liable for an error in judgment, or still worse, where he was clearly right, although a jury might be of a contrary opinion, would in my opinion entirely destroy the usefulness of this institution, by preventing any one possessing the necessary qualifications from accepting the position. Patients convalescent, but before soundness of mind was fully restored, would be discharged, only to suffer a relapse. Continual complaints would be made that patients were treated as insane who were not in fact, or that they were being detained longer than they should be, and suits innumerable, harrassing to the superintendent, with a tendency to bring the institution into disrepute and impair its usefulness, would follow with a result easily foreseen.

In my opinion the key to the entire difficulty must be found in the good faith of the superintendent. This implies and requires a careful, conscientious discharge of all the various duties assigned him under the laws, rules and regulations of the institution. If all this he has faithfully observed, he should not be held liable to respond in damages for error of judgment or mistake. If however he acts in a careless and negligent manner, indifferent as to whom he receives or detains, or as to the treatment they receive, or corruptly in improperly receiving or unduly detaining any person brought there, then for all such he should be held to a strict and rigid responsibility. This, in connection with the safeguards already referred to, will in my opinion reduce the dangers of abuse to the lowest possible degree. It will tend to increase and not impair the usefulness of the asylum.

While a difference of opinion exists among members of this court as to some of the above propositions, yet

all are agreed that the court erred upon the trial, and that for the reasons hereafter stated there must be a new trial.

As stated in the opinions of my brethren, the defendant was in no way concerned with what took place previous to the time Mrs. Newcomer was received at the asylum, and I need not enlarge upon what they have said.

Neither could the defendant be held responsible for what was said and done by his assistants, attendants or other patients in the asylum, unless the same was done under his orders or directions. As already said, it would be utterly impossible for the superintendent to personally perform all the duties arising. Much must be left for others to perform, who cannot be considered so far his servants or agents as to make him responsible for their sayings and doings. The proof offered as to plaintiff's circumstances, and as to what was done with her goods, was not admissible. Even had she been sent there by the proper authorities as a pauper, whether she was such in fact or not, could in no way concern the superintendent.

The plaintiff having introduced evidence that she was a physician, and offered evidence as to her practice and the value of the same, it was proper on cross-examination to inquire fully as to the kind of practice, and to inquire as to the means she adopted to acquire a practice either in the publication of hand bills or otherwise.

Evidence that money was sent to the plaintiff by her sister and that it did not come into her hands, should not have been admitted, as no claim was made or offer to show that it reached defendant or that he was in any way instrumental in depriving plaintiff thereof.

The question asked Dr. Spinney[1] was improper within

[1] Dr. Spinney had testified that in October, 1875, he had found upon a medical examination that the plaintiff, Mrs. Newcomer, was anæmic or bloodless; that the heart's action was enfeebled muscularly and that there was slight palpitation, nervous exhaustion, ravenous appetite and poor digestion; also that he discovered a slight dullness at two or three points in the lungs, and at those points slight bronchial irritation, but no disease of the structure of the lungs and no evidence that they had ever been in tuberculous condition.
He was asked, "From what you found at the time, in the exami-

the previous decisions of this court, as it called for a conclusion upon facts not stated. The correctness of the opinion given could not be tested by calling other experts, nor could the jury have any means of determining whether the facts upon which such opinion was based were correct or not. *Hitchcock v. Burgett*, 38 Mich.

The questions[1] put to the witness Julia Primmer

nation of her, from your knowledge of her during the years previous, and from the symptoms which you observed at that time, paralysis or trouble with her limbs, and the other difficulties under which she is laboring, what, in your opinion, produced the condition that you then found her in?"

[1] The direct testimony of the witness Julia Primmer is here given as stated in the record:

"My home is in Lenawee county. I am stopping at the asylum; have been there five years the twentieth of this coming month. At first I assisted on hall 14 six weeks; then I was in the dining-room five or six weeks; then I assisted on the hall until the third or fourth of October; then I had charge of 14 until Christmas; then assisted on the hall until the 8th of January, 1874; then I took charge of number 1, on this hall, and have been in charge of that hall and am still in charge of it.

Question—I wish you would tell us the number of attendants there are on hall 1, and have been there since you have been there.

Counsel for plaintiff objected because the question was not confined to the time when plaintiff was in the asylum, and was immaterial.

The court sustained the objection and the defendant excepted.

"I recollect the time plaintiff came there. There were three attendants on hall 1 at that time. Supervisor is the name given to the person who has charge of the hall. I was supervisor at that time, and Miss Josephine Rice was acting as assistant. The third one was Miss Dean, who had charge of the dining room. I had charge of, and was associated with, disturbed patients on hall 14. I mean by disturbed patients those that were laboring under excitement more or less. They were all insane persons; there were about twenty-five on hall 14; hall 1 accommodated 22, and I think it was full when plaintiff came. My whole time has been spent with insane persons at the asylum. I have slept in the same hall with them; the other attendants on hall 1 slept on the hall; lived with them and eat with them. Hall No. 1 was south, and No. 2 comes on the side and extends south; No. 8 runs east and west across the end of 1 and 2; Nos. 1 and 2 open into each other. I think there are 22 or 23 single rooms on hall 1. The assistant and dining room girl's room is the fourth room as you enter the hall in the center from the north end. My room is the dormitory. The sitting room is on the south end and my room is next to it near the south end of the hall. I recollect when plaintiff came there and the occasion when she was brought in on the hall. I was then supervisor in charge of that hall. That was about the first of October. The patients on that hall at that time were convalescent. She remained upon hall 1, I think, less than a week; she was then feeble; she walked around; she acted feeble, like a person in very poor health; she was very restless, walked around the hall aimlessly, without any object, and seemed to walk like some one lost, without

were proper and should have been allowed. The question as to her sanity or insanity while in the asylum was a material one. What she said and did while there, her appearance, and each and every act and circumstance which could possibly aid the jury in correctly determining the question should have been admitted. The broadest latitude in this respect should be allowed. This evidence

---

any object, groping around; she had an eruption on her skin that she picked continually; it was on her face and neck, on her chest more particularly; she picked more on her person than on her face; she would keep her clothing all open, exposing her person, and reach back on her shoulders, or under her arms, as far as she could, and pick those places off, and pick them up in her fingers and drop them down, reach and pick another one and do the same; she never would sit down hardly; we would sit her down and she would get up almost immediately and go around in the same manner. I tried to converse with her. She didn't enter into any conversation. I should judge she was not able to. I asked her questions and attempted to carry on conversation with her. She would not make any reply to questions, or it would be something indirect. She would not enter into any conversation, nothing that would be coherent. I recollect of hearing her quite often talk to herself. She was talking about taxes and papers. I never could make any thing out of it. It was in an under tone, and she directed her conversation to no one. The only thing that I recollect of was about the papers and taxes.

Question—Now then, you have spoken of these eruptions she had upon her person, and about her exposing her person and picking them, will you state whether or not this was in a manner offensive to those witnessing it?

Counsel for plaintiff objected because the same was irrelevant and asking for a conclusion.

The court sustained the objection and the defendant excepted.

"This picking was to such an extent that the other patients called my attention to it frequently. This picking is a habit that insane persons are in the habit of getting into. The plaintiff was insane when she was left on hall 1, and continued insane while on that hall. I never saw her take medicine while on that hall. It was offered to her and she refused it. It was offered to her the first night at eight o'clock. That same evening I had a conversation with Dr. Van Deusen about her refusing this medicine. I called his attention to it near the recess on hall 1, and he asked me what the reason was. He asked plaintiff in my presence why she refused to take it; she said that it had mercury in it. He explained to her; told her it was not mercury. He asked for the medicine and I brought it. He told her it was not mercury, it was simply a tonic, and explained to her what the medicine was. She still refused to take it. This talk between the doctor and plaintiff continued about fifteen minutes, I should think. She came on the hall soon after dinner, and this talk was at eight o'clock the same evening, and the first day she was there in the asylum. The doctor told her the medicine was calisaya. Plaintiff was at that time more disturbed and more insane than the other patients on the hall.

"Dr. Emerson (assistant physician) always visited the hall twice a day, except when he may have been absent, and then by

also tended to show why the plaintiff was removed from one hall to another, and for this purpose was admissible. The evidence as to Miss McNeil compelling patients to bathe in foul water was in any view of the case inadmissible. Even if this defendant could be held responsible for her acts, yet such evidence had no tendency to prove that plaintiff was compelled by this person to so bathe. Other questions were raised and discussed, but we think sufficient has been said to guide the court should another trial of this case take place.

For these reasons last given we all agree in ordering a reversal of the judgment and new trial.

The judgment will therefore be reversed with costs and a new trial ordered.

GRAVES, J., concurred.

COOLEY, J. On the first day of October, 1874, Mrs. Newcomer, the defendant in error, being at the passenger house of the Michigan Central Railroad at Albion,

---

some other physician. The hall was visited twice a day by some physician while she was there. These visits were made between half past nine and eleven o'clock in the forenoon and half past six and eight in the evening. During the time of these visits plaintiff was always on the hall, walking back and forth. I never knew her to sit down five minutes at a time. Miss Dygert, now Mrs. Manchester, took the medicine tray around the hall at the time plaintiff was there. She was supervisor on hall 8. Plaintiff bathed while she was on hall 1. I heard her statement about it on the stand last Saturday. Friday was the regular bathing day while she was there. It was the rule to bathe patients the first day they came to the asylum. Plaintiff was bathed the same day she came there. I think she was only bathed once on that hall. We bathe on the hall once a week. I heard her statement about being bathed in foul water in which another person had been bathed. I never heard of it; I never saw it done; she was not bathed in foul water. There is a pipe which conducts hot and cold water into the tub; there is a pipe to take the foul water off. When we let the waste water off all we have to do is to turn the faucet and it fills up again; we don't have to carry the water. She was not bathed in water wherein another person had been bathed. Myself and Miss Rice looked after the bathing in that hall. Miss Rice is still on that hall with me. The food furnished the patients on hall 1 was wholesome and well cooked. The patients and attendants were furnished the same kind of food, and plaintiff eat at the same table with us all. I never heard her make any complaint about her food while she was there. There was no medicine put into her food. She had a comfortable

was forcibly taken and put aboard the cars of that railroad and removed to the Michigan Asylum for the Insane at Kalamazoo, where she was restrained of her liberty until the fourth day of August following. The persons chiefly instrumental in procuring this confinement were her son-in-law and his mother, with whom she had had difficulty, but her daughter gave assent. The person who accompanied her on the cars and to the asylum was one of the superintendents of the poor of Calhoun county, who, it is now conceded, had no legal authority for interference beyond that which might be claimed for any citizen. The reason assigned for removing Mrs. Newcomer to the asylum was her insanity. There had been no judicial finding of the fact, and it is not alleged that there were any such manifestations of mental delusion . as indicated danger to others. The plaintiff in error was at the time in charge of the asylum, and he received and detained Mrs. Newcomer in the full belief that she was insane. It is shown in this case that the

room and the same kind of bed that is generally used there. The bed was first a wooden frame, and then bands of sheet iron an inch in width, about as thick as a case knife, placed back and forth on the bed about ten or twelve inches apart, the same as a rope or cord bed. The iron is not solid; it is Russia sheet iron. On top of this is placed a straw bed, hair mattress, blankets and comfortables. The plaintiff had the same kind of bedstead and bedding that was used by the other patients and attendants on that hall. I didn't hear her make any complaint about the bedstead and bed. I always considered them comfortable. She was removed from hall 1 to hall 8 on account of this continued picking of the eruption being offensive to the ladies. For that reason she was removed. I saw her on hall 8 once. Her mental condition at that time was the same. It was the next morning that I saw her. I saw her on hall 2 twice. The first time she was very sick, and I thought her mental condition was about the same. I don't remember of her speaking to me. The second time I saw her she was sitting up, and I said to her that she was getting better; her reply was, 'Yes.' Her mental condition was apparently better at that time. Before she left the asylum I saw her returning from the reception room; she was not lame.

"The medicine offered to the plaintiff was put into a small cup with the name marked on the outside. I never saw cups offered to her with some body else's name on. Standing and walking,—not sitting down much,—is a habit that depressed patients usually fall into. I don't recollect that at the time she came into the hall her dress and clothing were torn and disarranged, nor of her saying that she wanted to fix her clothing. I first saw her on the hall, and did not see her until she came upon the hall."

medical and other assistants in the asylum believed her to be insane while she remained there.

On being discharged from the asylum Mrs. Newcomer brought suit for false imprisonment, and has recovered as her damages $6,000. The gravity of the questions involved would have warranted bringing the case here had the recovery been nominal only; but this considerable recovery rendered that course imperative. The case has been very earnestly and forcibly presented on the part of the defense, in the full belief that the usefulness, perhaps the very existence, of the asylum depends upon the reversal of the judgment and the correction of the errors which are supposed to have led to its recovery.

I shall give no attention to any but the main questions in the case; all the others are fully and satisfactorily examined by Mr. Justice Marston, and I concur in what he says upon them.

Mrs. Newcomer claims never to have been insane at all, and the contest in the court below was mainly over the question of fact. She insists, however, that had she been insane, Dr. Van Deusen had no authority of law to restrain her of her liberty. The position assumed on her behalf is that, with perhaps the exception of indigent persons for whose case special provision is made by statute, no one can lawfully be sent to or confined in the asylum who has not been found to be insane on a regular inquisition for the purpose. This position is the first which it becomes necessary for us to examine; and it involves the whole theory of State action relating to this important institution.

The constitution provides that "Institutions for the benefit of those inhabitants who are deaf, dumb, blind or insane, shall always be fostered and supported." Art. 13, § 10. The provision is found in the article respecting education, between those which have for their object the support of the University and of the Agricultural

College. The position is significant, and gives emphasis to the word *benefit* which characterizes the policy indicated. Obviously what was had in view as a primary object was to aid in bringing this unhappy class to a better condition; to improve their mental state wherever it should be found possible; to establish in their interest a great and noble charity. The asylums were to be retreats for proper instruction and treatment, and not in any sense prisons or bedlams.

I have no doubt it is because this State policy was well understood by the people at large that there has been so little legislation on the subject. Provision has been made under which insane indigent persons may be sent to the asylum by the county authorities, but other cases have been left to the voluntary action of friends. The vast majority of those who have received treatment in the asylum have been sent and received with no other warrant than their manifest need of its benefits, and the superintendent in his action has accepted the request of friends and relatives as his sufficient justification.

That the system has worked well thus far is demonstrated by the fact that this is the first instance in which complaint of it appears in our records. Nevertheless there are possibilities in it which must not and cannot be overlooked. The facts in the present case show that it is entirely possible for complete strangers to seize upon a woman, forcibly take her into railroad cars, carry her a long distance without interference on their mere assertion that she is mentally unsound, and place her within the doors of the asylum where again the allegation of insanity must to some extent predispose the minds of those receiving her to turn a deaf ear to her protests. Indeed, when we admit that such things are possible, we concede that other things still more dreadful are also possible; but we shall not stop to contemplate, or even to suggest them. If the law permits this, we must take it with all its possible evils and abuses.

The defense insist that everything done in this instance, if the woman was insane, was lawful; and that if in point of fact a mistake was committed in supposing her to be insane when she was not, nevertheless the defendant cannot be held responsible, as he has acted in a public capacity, with undoubted and unquestioned good faith. The alternative of the plaintiff's sanity I shall pass by for the present, to consider whether, supposing her to be insane, the defense relied upon is made out.

I understand the counsel for the defendant to maintain the following propositions:

1. That insanity is a disease of which medical men are the best and in all uncertain cases the only competent judges, and that the determination of questions of sanity and the care and custody of the insane for that reason naturally and properly falls to them.

2. That insane persons are dangerous to others from their propensity to commit mischief, which they are liable at any moment to manifest though it may never have been exhibited before; and that therefore the State through its organized action, or any member of the political society, without other warrant than the imperious law of self-defense, may restrain their actions, and when no other restraint is provided, may properly remove them to the retreat the State has provided for their benefit.

3. That the helpless condition of insane persons, and the possibility of cure which is present in the early stage of most cases, imposes upon their relatives the solemn duty to take steps for their cure by placing them in the institutions specially provided for their treatment, and clothes them with all necessary power for the purpose: that they may restrain them of their liberty with a view to their cure as they might a person in the delirium of fever, or one who, in any case of mere bodily disease, was in danger, either purposely or through ignorance or temporary loss of prudence and discretion, of inflicting or causing self-injury.

4. That while in any case it might be proper to

have an inquisition of sanity before restraint was imposed if no reasons forbid, yet that the institution of such proceedings must generally be exciting and disturbing to the deranged intellect, and therefore harmful, and consequently cannot be required by the law, which demands only what is reasonable.

5. The conclusion is that restraint of insane persons in asylums is lawful, and being lawful, the placing them there, whether it be done by way of protecting the persons or property of others, or for the benefit of the insane persons themselves, is in itself due process of law, though there may have been no judicial investigation whatever.

I have formulated these propositions in my own language, but I understand them in substance to be advanced and maintained by the defense. To some of them I can render full and hearty assent. The members of the medical profession are undoubtedly the most competent, and in many cases the only competent judges of insanity. It would be nonsense to deny this, and unjust to admit it with hesitation and cavil as some do.

The careful study of the phenomena of insanity is confined almost exclusively to learned and humane members of this profession, and it would be gross ingratitude in society and in the State, if it were not ungrudgingly admitted that the amelioration of the condition of this unfortunate class, by relieving them of the barbarous and inhuman restraints to which ignorance formerly subjected them, and giving them the humane, soothing and healing treatment of comfortable asylums, is due mainly to the investigations and labors of this profession. But I cannot admit that because one is a practitioner of medicine, it is therefore proper or safe to suffer him to decide upon mental disease, and consign people to the asylum upon his judgment or certificate. While the high character of a large proportion of the medical profession, their learning, their self-devotion and humanity, entitle them to our highest respect and confidence, and

give to their conclusions in questions of medical science a weight that must generally challenge conviction, we cannot for a moment shut out from view the fact that the law throws wide open the doors of that profession, and that the ignorant jostle the learned in entering it, the unworthy have equal rights with the high-minded and humane, and it is not uncommon that the most unfit succeed for a long period in imposing upon the public. By no means known to the existing laws can it be rendered reasonably certain that, in the absence of public investigation, questions of insanity will be considered by competent persons and mistakes guarded against by those who are fit to judge.

Nor even when the investigation is public and conducted with the assistance of experts do we fail to encounter difficulties of the most serious nature, arising from differences of opinion among those who are called to give scientific evidence. In every case where the evidences of mental disease are obscure, opinion is certain to be divided, and we are brought face to face with this conclusion, that if physicians exclusively were to deal with the case, the person would be turned over to the asylum or discharged as sane, according as one physician rather than another happened to be called in as the adviser. If the liberty of the citizen must depend upon such accidental circumstances, it ought very clearly to be made to appear either that the safety of society requires that such perils should be encountered, or that adequate protection to those who are really insane admits of no better course.

The safety of society, it is said, does demand that every insane person should be placed under restraint, because the going at large of every such person is dangerous to others, and for self-protection they may be restrained by others without awaiting any judicial hearing. Moreover, it is further said, for their own good they should be restrained, in order that they may be treated for their malady and if possible cured; and

this should be allowed without a preliminary inquisition, because the inquisition itself must be exciting and injurious to the subject of it, and tend to defeat the very purpose for which it would nominally be had. These are important positions, and they deserve thoughtful attention. For myself I cannot assent to the proposition that the going at large of a person who is mentally disordered is in every case dangerous. It is a proposition that contradicts common observation. Many insane persons, even 'after they have become hopelessly so, are to all appearance perfectly harmless, and for years continue to discharge the common duties of life in the most regular and acceptable manner, being trusted by every one in those particulars to which the insane delusion does not extend. The law takes notice of the fact that in many cases the disease leaves the person in the responsible possession and control of most of his faculties, and that the same motives influence his action in the employment of them, that influence those not thus afflicted; in short, that the delusion is confined to a single subject or group of subjects, and in other respects leaves the person rightfully entitled to control his own actions. It may nevertheless be perfectly true that in every one of these cases there are possibilities of danger from the disease which circumstances have not yet brought out, and that every insane person may in a certain sense be considered a dangerous person, because he is more liable to sudden and unexpected manifestations of dangerous cunning or violence than a sane person would be. But conceding this does not fully meet the case. Whoever takes into his own hands so serious a responsibility as the confinement of a citizen upon his own judgment merely, assuming it to be necessary in self-defense, must show that, upon the evidence, danger from his being at large was not merely possible, but was probable. Many sane persons, under the influence of strong excitements are subject to serious and perhaps dangerous fits of passion; but another could not be

allowed, on this ground alone, to seize and imprison them, in anticipation that possibly the occasion for excitement might arise and the passion be manifested. A rule permitting this would introduce intolerable disorder.

Nevertheless I agree with the defense that it is not essential that a judicial hearing and determination should be had in every instance before an insane person can be admitted to the asylum. I concede that the right to restrain these unfortunate persons for their own benefit or for the protection of others is as clear as the right to restrain one who in the delirium of fever would break away from his attendants, or one who, with a contagious disease upon him, should attempt to enter a public assembly. But the first thing to be determined is whether there is insanity in fact; and in any case where that is open to possible question, prudence would dictate a judicial investigation unless the reasons against it are so imperative as not to admit of the necessary delay, or unless the investigation would probably be so far damaging to the subject of it as to more than counterbalance the probable benefits. It is no doubt true that a trial of the fact would be more or less exciting and disturbing to a mind already in a diseased or abnormal condition, but that the consequences would be more serious than those likely to follow from the sudden arrest and removal for confinement in the asylum of a person who believes himself perfectly sane is by no means certain. An insane person does not necessarily lose his sense of justice, or of his right to the protection of the law; and when he is seized without warning, and without the hearing of those whom he might believe would testify in his behalf, and delivered helpless into the hands of strangers, to be dealt with as they may decide within the limits of a large discretion, it is impossible that he should not feel keenly the seeming injustice and lawlessness of the proceeding.

The great defect, however, of all reasoning in favor

of confinement without legal investigation, is that it assumes the person to be insane. Being insane, it is said, he ought not to be subjected to the excitements of a public and perhaps prolonged investigation. But suppose he proves not to be insane; are there no consequences still more serious to be looked for, from exposing him to the excitements of a sudden seizure and incarceration without a hearing, and a prolonged detention among persons unquestionably insane? In this very case the man who seized and imprisoned this woman did so upon evidence of mental disease which, if he were a prudent man, he would not have acted upon in any important money transaction; the mere word of one or two persons who might, for aught he knew, be interested in making a false case for the purpose. Such treatment, in the case of a sane person of a highly sensitive physical and mental organization, must necessarily have a powerful tendency to induce the very condition which the arrest and confinement assumes, and if the law would permit it, the possible wrongs in individual cases would be nothing short of the destruction of the intellect itself.

It may be said with perfect truth that a public investigation is no very satisfactory or certain test of insanity, and that the superintendent of the asylum is much more competent to determine the question than the average judge or jury. But safety is not found in the competency of the tribunal merely: it is the publicity of the proceeding, and the opportunity that is afforded for meeting a fictitious or deceptive case that constitute the chief protection. There is always danger that a secret investigation shall be made by those who manage it, to reach the conclusion desired, irrespective of the real facts; and the intelligence of the tribunal can constitute but an imperfect protection. Indeed, if one is to be judged unheard, he must be condemned almost as a matter of course in any case where upon the facts there could be two opinions; and those are the very cases in which

investigation ought to be careful, particular and thorough in proportion to the gravity of the consequences of error.

But other difficulties in proceeding without judicial inquiry are also serious. If an insane person is to be confined on the ground that his going at large is dangerous to the community, any one person has the same right to pass judgment upon his case as any other, and when opinions differ respecting the necessity for restraint, one person may bind and another release the subject of their conflicting opinions at discretion. Such a condition of things could not be tolerated. The difficulties are the same in kind when the unqualified right of the family to remove a member to the asylum for his own advantage is conceded. In law it becomes necessary carefully to prescribe the limits of judicial authority, so that each tribunal shall act with unquestioned right within its own proper bounds; and shall be wholly excluded from the jurisdiction of others. This is necessary for the protection of all classes of officers; those who judge and those who are to execute their judgments; the latter class are entitled to know precisely what their duty is so that they may proceed to perform it without peril. But between the different members of a family proceeding to act upon their own opinions, the clashing of authority must be imminent in every case not perfectly clear and unquestioned. One part of the family may believe in an insanity which the other denies, and when the one rightfully confines, the other may rightfully demand the discharge. Nor in this family jurisdiction can the judgment of the supposed insane person be excluded, for until his insanity is determined he has the same right to judge that the others are insane as they have to judge that he is. It may happen—as indeed it sometimes has happened—that he will succeed in successfully accusing his accusers. In this case the son-in-law succeeded in placing the mother-in-law in the asylum. There is some reason from this record to believe that he has not had

the education and the advantages of intercourse with the world which she has possessed; and had he accompanied her to the asylum and attempted to deliver her there, it is quite within the limits of possibility that this woman, who if she is insane, has certainly exhibited remarkable skill and power in convincing others that she is not so, might with her superior address have succeeded in delivering him over as the disordered person who needed the treatment of the asylum. To say that the supposition is purely fanciful, and that the imposture would at once have been detected, is to deny that there can be a case which cannot be at once and correctly diagnosed; and that is to deny what is proved by common observation. The assertion that one is insane, when made by a member of the family, must always impress somewhat the minds of others, and the shock of the charge to the subject of it is not unlikely to lead to excited conduct which shall give to it some color of plausibility. Time, and patient observation and examination might be required to remove the impression, and meantime a great wrong would be done, and the purpose of the asylum in the particular case be wholly defeated.

It is true that the difficulties suggested did not exist in this case, for here the daughter assented to Mrs. Newcomer being placed in the asylum, and in the family no conflict of opinion was expressed. I put aside as wholly unworthy of a moment's attention the *ex post facto* assertion of the daughter that she was deceived into assenting by being told that her mother was to be taken as a sane person to the asylum for medical treatment; if the fact were so, she had abundant opportunity to correct the error, which she failed to embrace. There is no room for any question whatever that during all the time Mrs. Newcomer was in the asylum Dr. Van Deusen had reason to believe that he was detaining her there in accordance with the desire of her family and because she was insane. And in my opinion, if she was insane in fact, he was justified in so detaining her, for her own benefit and with a

view to medical treatment, under the facts as they were made known to him. A previous finding of insanity would have been a prudent proceeding, but it was not indispensable if the insanity actually existed and was not disputed in the family.

But I understand the defense to go further and insist that even if Mrs. Newcomer was really sane, Dr. Van Deusen, if he has acted in good faith, is not responsible in damages for her confinement. What in that case is the alternative is not very clearly pointed out by the defense. It cannot be that no one is responsible. The law of no free country can tolerate a condition of things under which a person innocent of crime, and threatening no injury to himself or to others, can be restrained of his liberty, and no person be responsible for the injury he suffers. To admit the possibility would be to concede that arbitrary imprisonment under some circumstances is lawful; and that would be to concede that regulated and protected freedom does not exist. But if the superintendent is not responsible, we look in vain for adequate responsibility anywhere. No doubt the abductors are liable, not only for what they did, but for whatever has been done by others under their express or implied direction; but a new agency takes part in the confinement, and the immediate responsibility must be upon some one having authority where the confinement takes place. If it is not the superintendent, it must be either the trustees of the institution, or the State itself, as the controlling board or authority. But there is only one theory on which either the trustees or the State could be held liable; and that is, that the superintendent was their agent and servant, and committed the wrong in the actual or supposed execution of their orders. I need not pause to give reasons why this theory is wholly inadmissible; it is sufficient for the purposes of this case to say, that admitting the responsibility of the trustees or of the State would not in any degree relieve the superintendent; for the servant may always be made to respond individually

for his own trespasses, even though in law they be imputable to his superior also.

If therefore Mrs. Newcomer was sane when placed in the asylum, what can be said on behalf of the superintendent is, that acting in perfect good faith, and influenced only by public and proper motives, he has committed a mistake through which this woman has been greatly wronged. Do his good faith and correct motives excuse the mistake?—is the question now. The exact position and authority of the superintendent of the asylum are not so well defined that serious questions concerning them may not arise. But I think he is to be classed with the public officers of the State, and is entitled to all the advantages and protections which the law accords to officers performing analogous duties. The legal protections which the law accords to officers must depend largely upon the nature of their duties; whether they are ministerial merely, or are discretionary or judicial. If they are ministerial, the officer has a line of duty clearly marked out for him, and he must follow it at his peril; if they are judicial in the full sense, the very nature of the authority is inconsistent with civil responsibility for mistakes in judgment. Legislators cannot therefore be sued in tort by dissatisfied constituents, nor judges by dissatisfied suitors. There are, however, a class of duties which in a qualified sense are judicial and in another sense are ministerial, where the officer is required to do certain acts with limited powers to pass his own judgment upon the rights of others. In such cases the officer has been held exempt from responsibility where he has acted in good faith, however great his error, but liable where another has suffered from his ignorance or his malice. That rule of responsibility was laid down in this State in the case of *Gordon v. Farrar*, 2 Doug. (Mich.), 411, where election inspectors were sued for refusing to receive a ballot from one who claimed a right to vote. The same rule has been applied in election cases in several of the States. *State v. M'Donald*, 4 Harr.,

555; *Miller v. Rucker*, 1 Bush, 135; *Carter v. Harrison*, 5 Blackf., 138; *Goetcheus v. Matthewson*, 61 N. Y., 420; *Weckerly v. Geyer*, 11 Serg. & Rawle, 35: *Dwight v. Rice*, 5 La. Ann., 580; *Rail v. Potts*, 8 Humph., 225; *Wheeler v. Patterson*, 1 N. H., 88; *Peavey v. Robbins*, 3 Jones (N. C.), 339; *Fausler v. Parsons*, 6 W. Va., 486. It has also been recognized in a variety of other cases, such as that of a school board removing a teacher, *Burton v. Fulton*, 49 Penn. St., 151; or expelling pupils from school, *Donahoe v. Richards*, 38 Me., 379; *Stewart v. Southard*, 17 Ohio, 402, and in other analogous cases. *Ferriter v. Tyler*, 48 Vt., 444; *Billings v. Lafferty*, 31 Ill., 318. There is force in the suggestion that if such officers are entitled to be sheltered under the protection of their good faith, the superintendent of this asylum has a like right.

There are cases in which the powers which the superintendent necessarily exercises seem to be judicial. I allude particularly to the case of patients received when insane, and improved and supposed to be cured by the treatment they have received. The time comes when such persons are entitled to their discharge, but exactly when it has arrived the superintendent must in the first instance decide. Should he maliciously continue the confinement after a cure had been effected, he would rightfully be held responsible; but if through error in judgment he failed to discharge the patient, he might with great justice claim the benefit of the rule which under corresponding circumstances protects officers who exercise authority of a *quasi* judicial nature. But under such circumstances the superintendent is dealing with a case in which insanity having unquestionably existed, a presumption of its continued existence favors his action. The case before us was not of this character. There was no presumption against the sanity of this woman when she was placed in the asylum, and the question on this part of the case must be whether the superintendent was vested with any authority to pass judgment upon her insanity in a manner that can protect him.

Upon that subject it appears to me that I need say no more than this, that neither the constitution nor the statute has undertaken to give him the authority, nor in my opinion could it be given to him or to any other tribunal with the privilege of proceeding secretly, and without giving to the alleged *non compos* and his friends the opportunity to produce evidence to show that the allegation of insanity was unfounded. The privilege of defending the intellect is as sacred as the privilege of defending life itself, and it is not to be lightly assumed that the Legislature has ever intended to confer it upon a single officer acting *ex parte*. The powers actually conferred upon this office, are clearly administrative and limited, and like all corresponding officers, he must at his peril keep within their limits. The hardship of this is not special and peculiar to his office. The sheriff commits an actionable wrong when by mistake he arrests the wrong person, or levies on property not belonging to the defendant in the writ: the magistrate may commit a similar wrong in honestly asserting a jurisdiction he does not possess; the assessor in mistakenly imposing a tax upon a person not within his jurisdiction; the military officer in enforcing military law under error regarding his legal powers, and so on. All officers are liable to similar errors, but the rule of law, no less than the rule of justice, is that he who commits the mistake shall bear the consequences. The opposite rule would invite outrage and wrong instead of tending to prevent them, and would therefore be wholly inadmissible. Purity of motive should protect the officer against excessive damages, but individual rights must have settled and definite rules of protection, and cannot be left to depend upon the opinion of an officer as to what he may or may not do in abridging them.

The English system for the treatment of the insane has been brought to our attention, and some things said in its favor in official reports have been read. It is a system of private asylums with rigid public super-

vision, and no doubt it has subserved an admirable purpose. But it is susceptible of the grossest abuses, and those who praise it as a great public benefaction must nevertheless concede that serious individual wrongs are not only possible but probable under it. The fact is patent that under that system it is for the interest of those who have charge of the insane to prolong confinement rather than to shorten it; to nurse disease rather than to cure it; perhaps even to confine persons not insane at all, when malice and cupidity deliver them over. The people of this State reject that system; not for its advantages, but because they would have its advantages without its liability to abuse. They would have the insane confided for treatment to those whose humane sentiments and sense of duty shall not be bribed to abuse by self interest. But they have given to the asylum authorities no jurisdiction whatever over sane persons; and nothing ought to be more certain in the administration of the State's benevolence than that a sane person never passes behind the doors of its asylums as a prisoner. This can never be the case so long as a woman can be seized by a stranger, transported across the State, and delivered to its authorities without any warrant or symbol of authority, and yet with a grasp apparently as firm and inexorable as though the majesty of the law accompanied him, and enjoined implicit acquiescence upon every one whom he might encounter on the public conveyances.

But I think the circuit judge was in error in applying to the case the rule of responsibility which is applied where several persons are joint participants in the same wrong. The theory of the prosecution seemed to be that Dr. Van Deusen was the keeper of a great prison into which he made it his business to entrap and confine weak and helpless people; that for this purpose he entered into conspiracy with wicked and depraved people outside; with children who would get rid of their parents in order that they might seize upon their property; with

men who quarrelled with their wives' relations and would rid themselves permanently of the disagreeable association; with any man who had animosities to gratify, and found the mad-house the most convenient means for the purpose; and that he stood at the door of this hideous place of confinement ready to seize and thrust into its hopeless cells every victim whom avarice or malignity might entice or drag within his reach. He has therefore been punished in this case, not for the confinement merely, but for the malice of the son-in-law and his relations, and for conduct of others to which he was a total stranger. All the little circumstances of the affair from beginning to end which tended to show misbehavior in others have been carefully collected and arrayed in a striking light as appeals to the sympathies of the jury against him, and their whole force has been thrown against the very person who it is conceded, has acted in good faith throughout, and whose benevolent intentions cannot successfully be disputed. Indeed, one might infer from his being selected as the person to be punished for the wrong done by all, that his good faith was supposed to aggravate the offense rather than to mitigate it, and that an error of judgment in one whose motives were of the highest benevolence, was more culpable than the malice or cupidity which had brought about the error by their unfounded accusation.

Had all the parties concerned been joined as defendants, it may possibly be that under the technical rules of law it would have been impracticable to separate the act of the superintendent from that of the others, and hold him responsible for his own conduct only. The law in general refuses to apportion the consequences of a wrong as between wrong-doers, and had the suit included as defendants all the parties concerned, possibly it would have been necessary to render judgment for the same damages against all. But Dr. Van Deusen has been sued alone. If he is guilty of any wrong it is of the wrong of confining the woman in the asylum. He was

wholly unconnected with all that preceded, and was as much a stranger to it, either in intent or knowledge, as any other citizen of the State. The abduction of this woman was not his fault in any sense. If in any other action he might, under somewhat harsh and technical rules of law be held responsible for it, in this action, which proceeds for his own misconduct, his responsibility should be held to begin where his connection with the case begins. He received the woman at the door of the asylum knowing nothing of what had preceded, and his fault, if fault there was, dates from that moment. Others are justly responsible with him for the confinement, because they procured it, but he is not justly responsible with them for the abduction, because he had nothing to do with it whatever. He was a public officer, who believed that his duty called upon him to act as he did at that time under the circumstances; if he erred in judgment on the circumstances as they appeared to him, he is liable, though his motives were pure; but it would be wholly inconsistent with the rules of responsibility for legal wrongs to hold him liable for the conduct and malice of others with which he was only connected by succession of events, and not otherwise.

In what is above said I have assumed that Mrs. Newcomer when brought to the asylum denied her insanity, so that the restraint was substantially against her protest. If it should appear on a new trial that such was not the fact, I agree with Mr. Justice Campbell that the superintendent was justified in receiving her as a patient.

CAMPBELL, C. J. The views more fully expressed by my brother Cooley upon the main legal question as to the liability of the superintendent, in which I substantially concur, will render it unnecessary for me to say any more than will suffice to explain some views which have governed my conclusions.

The plaintiff in error has not been, and I think could

not be, made a final arbiter of the correctness of his own action. That would make him a judge in his own case, and deprive parties secluded by him of necessary legal protection. Unfortunately our laws have made no special provision for action by any public officer in cases of private persons who are not paupers, and who are not under guardianship; and in such unprovided cases there is no alternative left to the superintendents of our asylums except to act on their common law responsibility. I have no doubt that the regular certificate of any public officer who should be intrusted with the duty of conducting investigations in such cases would be a complete justification to a superintendent acting on it in good faith. The present case shows that it is important for the welfare of our public institutions that their managers should be protected from any undeserved vexation.

The proceedings to determine the capacity of persons to be left at their own disposal, or put under the care of others, while in a certain sense they are somewhat analogous to ordinary judicial inquiries, may be summary, and are not necessarily long or troublesome; and they can always be conducted with as little notoriety and annoyance as is consistent with public and private safety. They certainly need be no more annoying than the removal and seclusion of unwilling parties. But it certainly cannot be tolerated that persons who may be sane should be deprived of legal protection upon the risk that persons actually insane may be unduly excited by such legal steps. The danger is largely imaginary, but whatever may be its extent it must not be made a pretext for secluding persons who may be sane.

The law has but one test of insanity, and that is whether a person is *compos mentis*, or capable of exercising rational self-control. If not so capable those who have by relationship or otherwise become the actual and proper custodians of the person who is *non-compos* may lawfully place him in a public asylum for treatment, and the superintendent may lawfully receive him. Having

so lawfully received him, he may lawfully retain him
while in good faith he believes him insane, unless dis-
charged by habeas corpus or by the request of his friends.

Nothing but actual insanity will authorize the seclu-
sion of one who makes known his objections and claims
against reception. If no objection is made by a sane
person to his own seclusion he cannot complain of it
afterwards.

The authorities are uniform that there must be consent
or actual insanity. *King v. Coate*, Lofft, 73–76; *Brook-
shaw v. Hopkins*, Lofft, 240; *In re Shuttleworth*, 9 Q.
B., 651; *Rex v. Gourlay*, 7 B. & C., 669; *Anderdon v.
Burrows*, 4 C. & P., 210; *Rex v. Turlington*, 2 Burr.,
1115; *Rex v. Clarke*, 3 Burr., 1362; *Scott v. Wakem*, 3
F. & F., 328; *Symm v. Fraser*, 3 F. & F., 859; *Hall
v. Semple*, 3 F. & F., 337; *Fletcher v. Fletcher*, 1 Ell.
& Ell., 420; *Ex parte Greenwood*, 24 L. J. Q. B., 148;
*Denny v. Tyler*, 3 Allen, 225; *Look v. Dean*, 108 Mass.,
116; *Colby v. Jackson*, 12 N. H., 526; *Davis v. Merrill*,
47 N. H., 208.

For the purpose of treatment in an asylum, it is cer-
tainly not necessary that, in addition to insanity, there
should be evidence of danger to the lunatic or others
beyond what is implied in the insanity itself. For other
purposes not designed for the care of the patient, impris-
onment could not be justified probably without some
danger. It is always justifiable in such cases. *Lott v.
Sweet*, 33 Mich., 308. But no such danger was necessary
to be shown here.

Dr. Van Deusen was, in my opinion, fully justified
if Mrs. Newcomer was not sane, or if she made no plain
objection which he was bound to regard, so as to call
his attention to her claim of sanity.

If she was insane then there was nothing to make
out any cause of grievance whatever. And if she was
sane there was no testimony in the case which could
properly make Dr. Van Deusen responsible for any act
of her relatives or their agents, or for anything beyond

what was necessarily incident to the confinement in a properly regulated asylum. The rules and regulations were all shown beyond dispute to be proper, and if any other person in the asylum without his procurement did acts of an improper character, he cannot be bound to respond for them. There was no evidence legally tending to show conspiracy or bad faith in plaintiff in error, and the testimony of insanity was very strong. And I cannot avoid the belief that unless the jury had been instructed that Mrs. Newcomer could not be confined unless dangerous as well as insane, no verdict could have been rendered against Dr. Van Deusen.

Much irrelevant matter was introduced, and some rulings were had upon professional evidence and other points which were objectionable, but which are referred to by my brother Marston, with whom on these points I concur.