SPARROW v. INGHAM CIRCUIT JUDGE.

APPEAL FROM PROBATE COURT—INSANITY.

No provision is made for an appeal from an order of the probate court committing a person to an insane asylum under Act No. 204, Pub. Acts 1895, and an appeal cannot be taken under section 6779, 2 How. Stat., authorizing appeals from orders of the probate court in all cases not otherwise provided for.

*Mandamus* by Edward W. Sparrow to compel Rollin H. Person, circuit judge of Ingham county, to dismiss the appeal of Mary H. Sparrow from an order of the probate court committing her to an insane asylum. Submitted April 28, 1896. Granted May 12, 1896.

*M. V. & R. A. Montgomery*, for relator.

*Smith & Lee*, for respondent.

GRANT,. J.   The relator, Edward W. Sparrow, filed a petition in the probate court of the county of Ingham, setting forth that his sister, Mary H. Sparrow, was afflicted with a form of insanity known as paranoia.   An order for an inquest was duly entered, and the inquest held, resulting in a finding by the physicians, and an order of the court, that Miss Sparrow was insane, and directing that she be taken for care and treatment to one of the state asylums, as a private patient.   These proceedings were had under Act No. 204, Pub. Acts 1895, which will be found in the margin.   The inquest was a long one, many witnesses were sworn, and two prominent physicians, who were appointed by the court, listened to the testimony, examined the patient, and filed their certificate of insanity.   Miss Sparrow thereupon took an appeal to the circuit court.   The respondent refused to dismiss the appeal, and the purpose of this application is to secure the writ of *mandamus* to compel the reversal of that order and the dismissal of the appeal.   The sole question presented is, does the right of appeal exist in such cases?   The act makes no provision for an appeal, and the sole claim on behalf of the respondent is that it

NOTE.

Pub. Acts 1895, No. 204, p. 373.

An act to amend section twenty-one of act number two hundred and twenty of the session laws of eighteen hundred eighty-nine, entitled "An act to amend sections twenty-one and twenty-two of act number one hundred and thirty-five of the public acts of eighteen hundred eighty-five, entitled 'An act to amend, revise, and consolidate the laws organizing asylums for the insane, and regulating the care and management thereof, and of the inmates therein, and to repeal act number one hundred and sixty-four, laws of eighteen hundred fifty-nine; also act one hundred and ninety-four, laws of eighteen hundred seventy-seven; also act ninety-one, laws of eighteen hundred seventy-three, and the acts amendatory thereto; also act number one hundred and seventy-two, laws of eighteen hundred seventy-three,' approved June third, eighteen hundred eighty-five," being section ninety-one hundred thirty *c*,. Howell's Annotated Statutes of Michigan.

SECTION 1. The people of the State of Michigan enact, that section twenty-one of act number two hundred and twenty of the ses-

exists by virtue of section 6779, 2 How. Stat., which reads as follows: "In all cases not otherwise provided for, any person aggrieved by any order, sentence, decree, or denial of a judge of probate may appeal therefrom to the circuit court for the same county."

This provision was enacted early in the legislation of the State, and is found in the Revised Statutes of 1846. At that time no jurisdiction to determine the insanity of persons, for the purpose of confinement and treatment, had been conferred upon courts of probate. Provisions were subsequently, from time to time, enacted by the legislature for the confinement and treatment of the insane, and especially for those of the pauper, indigent, and criminal classes. Prior to the enactment of statutes providing for an inquest to investigate and determine the insanity of private persons who had means, or whose friends were able to provide for them, they had been received into the state asylums upon the application of their relatives and friends. In 1879 the claim was made that the insane asylum at Kalamazoo was not designed for the reception and treatment of persons who had sufficient means to secure care and treatment elsewhere. This court, however,

sion laws of eighteen hundred eighty-nine, entitled "An act to amend sections twenty-one and twenty-two of act number one hundred and thirty-five of the public acts of eighteen hundred eighty-five, entitled 'An act to amend, revise, and consolidate the laws organizing asylums for the insane, and regulating the care and management thereof, and of the inmates therein, and to repeal act number one hundred and sixty-four, laws of eighteen hundred fifty-nine; also act one hundred and ninety-four, laws of eighteen hundred seventy-seven; also act ninety-one, laws of eighteen hundred seventy-three, and the acts amendatory thereto; also act number one hundred and seventy-two, laws of eighteen hundred seventy-three,' approved June third, eighteen hundred eighty five," be and the same is hereby amended so as to read as follows:

SEC. 21. No person who is a resident of this State shall be held as a private patient in any asylum, public or private, or in any institution, home, or retreat for the care or treatment of the insane, except upon the certificates of two reputable physicians under oath, appointed by the judge of probate of the county where such alleged insane person resides to conduct an examination, and an order from said judge of probate setting forth that the said person is insane, and directing his removal to an asylum or institution for

determined otherwise, and held that it was not the design
to exclude any of these unfortunates from the care and
treatment which those specially fitted by experience and
study might give.   *Van Deusen* v. *Newcomer,* 40 Mich.
90.   The court in that case were equally divided upon
two propositions: (1) Whether the superintendent was
liable, in an action for false imprisonment, for detaining
a person whom he in good faith believed to be insane,
and who was admitted without any inquest; and (2)
whether, in doubtful cases, an inquest was a prerequisite
to confinement in the asylum.   Not long after, the legis-
lature made provision for such inquest, the last provision
being that under which the present proceeding was had.

The authority for an appeal from one court to another
must be found in either the Constitution or the statute.
It is conceded that the right of appeal in this case is not
found in the Constitution, and, if it exists at all, it must
be found in the statute.   Not every order of a probate
court is appealable.   *Walker* v. *Hull,* 35 Mich. 488;
*Moore* v. *Moore,* 48 Mich. 272.   In these cases the court
has given reasons why certain orders are not appealable,
some of which are applicable here.   Where the statute
contains no language indicating the existence of the right

the care of the insane.   When the relatives or friends of any in-
sane person shall make application in his behalf for an order ad-
mitting him to any asylum, public or private, or to any institution,
home, or retreat for the care or treatment of the insane, to the
judge of probate of the county where he resides, the judge of pro-
bate shall institute an inquest and take proofs as to the alleged
insanity before granting such order, and shall immediately notify
such alleged insane person of such application, and of the time
and place of hearing to be held therein, and any relative or other
person having such alleged insane person in charge or custody
shall likewise be notified of said time and place of hearing, and
the judge of probate may appoint a guardian *ad litem* to represent
such insane person upon such hearing, and shall fully investigate the
facts; and if the judge of probate shall deem it necessary, or if
such alleged insane person shall so demand, a jury of twelve free-
holders, having the qualifications required of jurors in courts of
record, shall be summoned to determine the question of insanity;
and the said judge of probate pending such proceedings, if it shall
appear to be necessary and essential so to do, such alleged insane
person may be placed in the custody of some suitable person, or
may be moved to the asylum of the district in which said insane

of appeal, the purpose of the law is an important, if not the controlling, consideration in determining whether the right of appeal exists by virtue of a prior general statute permitting appeals, especially where the tribunal, at the time of the passage of the general act, had no jurisdiction over the subject of the later statute. If the appeal will destroy, or tend to destroy, the very purpose and benefit designed to be accomplished by the law, courts will hesitate long before determining that the right of appeal exists by virtue of the former statute. He would be very obtuse who did not perceive that the chief object of this act is to furnish in the early stages of the disease the best medical treatment available, in order to effect a cure, and prevent, if possible, the terrible result of permanent insanity. If appeals are allowed in these cases, they may not reach a trial and determination in the circuit court for one or two years. A writ of error will then lie to the Supreme Court. If error is found, a new trial must be granted, and it may be years before a final determination can be reached. Meanwhile the sick person, unless dangerous to the lives and property of others, must remain without treatment, and permanent insanity may result, where prompt treatment by skilled physicians might cure the malady. This point is ably discussed by Mr. Justice

person resides, or to any hospital, home, or retreat, to be detained until such application can be heard and determined: *Provided*, however, that the period of such temporary detention shall not exceed in all fourteen days, and all the expenses thereof shall be paid by the petitioner or out of the estate of said alleged insane person. Such alleged insane person shall have the right to be present at such hearing, unless it shall be made to appear to the judge of probate, either by certificate of the medical superintendent of the asylum or the officers in charge of such hospital, home, or retreat to which he may have been temporarily committed, or by the certificates of two reputable physicians, that his condition is such as to render his removal from the institution for that purpose, or his appearing at such hearing, improper and unsafe. The said judge of probate shall, if satisfactory evidence is adduced showing the alleged insane person to be of unsound mind, and in need of care or treatment in an asylum, home, or retreat, grant an order for the commitment of such insane person to such institution, there to be supported as a private patient. Before making his order committing an insane person as a private patient to any of the public asylums supported by this State, the judge of probate shall

MARSTON in *Van Deusen* v. *Newcomer*, 40 Mich., at page 112. It is not reasonable to suppose or infer that the legislature intended to provide for any such condition of affairs. They did intend to provide a speedy and competent tribunal to investigate and determine whether the malady existed, and provide for prompt and efficient treatment. No other conclusion is possible, or consistent with the humane purpose of the law. The patient is not required to be present at the inquest, provided it is considered unsafe or unwise for him to be there. The probate court, upon an *ex parte* showing, may order the patient to be taken to the asylum, and there remain pending the hearing and decision. From this order, it is conceded, there is no appeal.

Her counsel appear to be alarmed at the result of holding that this inquest is final, and speak of the result of "confining the person [who is sane] to a living grave within the walls of an asylum." Such an argument has no merit. Such a result is scarcely possible, under the humane provisions of the law of this State, which are ample to prevent it. Neither the court nor the physicians have any object in adjudging a sane person insane, nor have the skilled and learned physicians in our asylums any object in keeping any sane person within their walls.

---

require the petitioner, or friends of such insane person, to enter into such bond for the support of such insane person thereat as may be provided by the by-laws thereof, and to pay such sum to the medical superintendent or treasurer thereof as an advance payment towards his support as such by-laws may require, which bond shall be signed by at least two sureties, who shall justify their responsibility on oath before such judge of probate; and said judge of probate, at the request of the medical superintendent of the asylum in which any insane person may be committed as a private patient, may require such sureties to justify their responsibility anew, or order that a new bond be filed in the place and stead thereof.

The order of the judge of probate shall be in the following form:

STATE OF MICHIGAN, } ss.
County of ———. }

At a session of the probate court for the county of ——— holden at the probate office in the ——— of ——— on the ——— day of ——— in the year one thousand eight hundred and ———.

Present ———, Judge of Probate.

In the matter of ———, an alleged insane person.

Prior to the enactments providing for inquests, private persons might be confined and treated in the state asylum upon the application of relatives or friends, and no question was ever raised as to the legality of such confinement, provided that such persons were in fact insane, until the case of *Van Deusen* v. *Newcomer.* That case was of great public interest, and it is fair to assume that the legislature were familiar with it, and framed the subsequent enactments with reference to it. The inference is therefore natural that the legislature, as well as this court, recognized the propriety and necessity of providing a method of procedure which should be speedy and effective, and avoid the tedious delays in appellate courts.

Furthermore, the authority conferred upon the probate judge is not found in a statute providing for the organization and prescribing the jurisdiction and duties of judges of probate and probate courts. The title of the act in which it is incorporated relates to the organization of asylums for the insane, and the regulation of their care and management. The legislature might, with equal propriety, have provided for a board of physicians, or authorized any other officer or tribunal to hold the inquest. This has been frequently done. Where a person has escaped indictment, or been acquitted of a criminal charge, on the ground of insanity, the court is re-

---

To the Medical Superintendent of the ———:

Having received the certificates of ——— and ———, duly qualified medical examiners in insanity, appointed by this court, by whom ——— of ———, an alleged insane person, was personally visited and examined, and after notifying the said ——— of the proceedings to be taken in h—— case, and having taken the testimony of ———, credible witnesses, and having fully investigated the facts in the case with ——— the verdict of a jury as to the question of insanity, I, the judge of probate in and for said county, do find that the said ——— is insane, and a fit person for care and treatment in the ——— asylum.

[It is therefore ordered that the said ——— be removed to ——— asylum, there to be supported as a private patient.

———————————,
Judge of Probate.]

This act is ordered to take immediate effect.
Approved May 24, 1895.

quired to make a further examination, and, upon ascertaining that his insanity continues, may order him sent to an asylum. So if a person is in confinement under indictment or sentence of imprisonment on a criminal charge, or on civil process, the circuit court commissioner of the county, or, in his absence, the judge of the circuit court, is charged with the duty of holding the inquest. 1 How. Stat. §§ 1908–1910. The statute makes no provision for appeals in these cases, and none has ever been supposed to exist.

One of the humane provisions of this statute is that it permits the person who has been adjudged insane to apply to the probate court to determine whether he is healed. If the court, upon the hearing, adjudges that his sanity is restored, may his relatives or friends take an appeal to the circuit court? Such a course would be cruel, and, we may safely assert, was never intended by the legislature.

Counsel for the respondent state in their brief that no right of appeal is given in condemnation proceedings authorized to be instituted in probate courts, and that many appeals have been taken. In this counsel are certainly mistaken. The law expressly provides for appeals in these proceedings. Sess. Laws 1855, Act No. 82; Sess. Laws 1873, Act No. 198, 1 How. Stat. § 3337. Counsel are also mistaken in their assertion that numerous appeals have been taken from decisions of the probate court under the drainage law, while the act itself does not provide for an appeal. It is true that the various drainage acts do not provide for an appeal upon the merits, nor have I been able to find a case where such an appeal has been attempted. The cases involving proceedings under the drain law are very numerous. The regularity and validity of these proceedings have always been raised in this court by petitions for the writ of *mandamus* to compel or restrain action, or by bills in equity to restrain the collection of the tax imposed, or to remove a cloud from title, or by the writ of *certiorari.* In the case of *Tucker*

v. *Drain Commissioner*, 50 Mich. 5, this court refused
the writ of *certiorari* to review defects in drain proceed-
ings; holding that the party aggrieved should seek re-
dress by appropriate proceedings in the circuit court,
whence the appellate jurisdiction of the Supreme Court
may be resorted to. In 1885 the legislature provided that
such proceedings should be the subject of review upon
*certiorari.* 3 How. Stat. § 1740e4. It is certainly sig-
nificant that the legislature should provide for an appeal
in condemnation proceedings, and that no right of appeal
has ever been supposed to exist in the drain law. It
seems a fair conclusion from the various acts providing
for condemnation proceedings, and from the interpreta-
tion placed upon the drain law, that in these special pro-
ceedings, which are ancillary to some main purpose, and
are committed to the probate judge or probate court for
determination, no right of appeal is intended. This is es-
pecially true where the humane purpose of the statute
would evidently be thwarted if the right of appeal existed.

There is no sound reason for an appeal. This statute
accords a public hearing, the benefit of learned and astute
counsel, examination by two disinterested physicians,
and in addition, if desired, the determination of a jury of
12 freeholders. What greater safeguards could be pro-
vided? Upon what theory can it be claimed that another
court or another jury would be better qualified to deter-
mine one's mental condition, or more liable to arrive at a
correct conclusion? Is it a wise policy to keep persons,
who are alleged to be insane, before the courts, year after
year, before they can receive the skilled treatment pro-
vided by a humane law? It would require clear and
explicit provisions in the law to convince us that the
legislature so intended.

We have been able to find but one case in point, and
that is so clear and full in its reasoning that, if we
were in doubt ourselves upon the question, we should feel
inclined to adopt and follow the decision and reasoning of
he court of last resort of a sister State. That case is

*People* v. *Gilbert*, 115 Ill. 59. The statute of Illinois is, in all essential particulars, the counterpart of ours. The point raised there was the same as that here. The relator relied upon the right of appeal given by a prior statute, but the court held that no right of appeal in these proceedings was conferred. The following is the reasoning of the court:

"The taking an appeal would suspend the proceeding, and leave the insane person at large until the appeal, and, perhaps, further successive appeals, could be decided, while there might be necessity, for the person's own safety and benefit, as well as the safety of others, that he should be immediately placed in an insane asylum for confinement, and to receive medical treatment there. In the case of an appeal there is always an appeal bond provided for, which is supposed to be a full indemnity against all the inconvenience of delay from the appeal. But an appeal bond would be utterly useless in the way of obviating, or in any way indemnifying against, the mischief of the delay which would be caused by the taking of an appeal in such a case as this. An appeal would frustrate the object of the proceeding,—the immediate commitment of a person deemed to be insane to an institution for the insane for safe-keeping and treatment. The act makes provision for the temporary detention of the person alleged to be insane, if deemed necessary, pending the proceeding and previous to the verdict, and after verdict, and pending admission to the hospital, by providing that the court may make such order in that behalf as the case may require, and that a certified copy of the order shall authorize the person to be temporarily detained by the sheriff, jailer, or other suitable person to whom the order shall be directed. But no provision is made for any such temporary detention pending an appeal,—a manifestation that no appeal was intended to be given. It is true that, notwithstanding the contrary finding of the jury, the alleged insane person might be sane, and the ill consequences supposed might not result from the allowance of an appeal. But, if the appeal lies, it lies in all cases equally, whether the person be a raving maniac, mildly affected with insanity, or be in fact sane. There can be no distinction made. The finding of the jury and the order of the court, at least, must be taken as

presumptive evidence that the person alleged to be insane is insane, and that his case renders proper his immediate commitment to the state hospital for the insane, and that the delay of an appeal might be fraught with injurious consequences."

The writ must issue as prayed, but without costs.

MONTGOMERY, HOOKER, and MOORE, JJ., concurred. LONG, C. J., did not sit.